DECISION
Before this Court is a motion for summary judgment brought pursuant to Super. R. Civ. P. Rule 56 by Defendants, Stephen E. Pascarella and John J. Trench, as general partners of the accounting firm, Pascarella Trench (PT), on all of Plaintiff's claims. Plaintiff, Paul V. Anjoorian, alleges that PT committed malpractice in the preparing of financial statements, and that the Plaintiff suffered pecuniary harm as a result. The Defendants have also moved to strike portions of the Plaintiff's opposition to the motion for summary judgment and portions of the affidavits accompanying the Plaintiff's objection. Plaintiff has filed objections to these motions. The Court has jurisdiction of this claim under G.L. 1956 § 8-2-14.
 Facts/Travel
Plaintiff formerly was the owner of fifty percent of the issued shares of Fairway Capital Corporation (FCC), a Rhode Island corporation. The other fifty percent of the shares were held by the three children of Arnold Kilberg: Gary, Cheryl, and Jennifer Kilberg. Arnold Kilberg himself owned no stock in the corporation, but served as the day to day manager of the company. FCC was in the business of making and servicing equity loans to small businesses under the regulation of the United States Small Business Administration (SBA), and was capitalized by loans from the SBA and a $1.26 million investment by the Plaintiff. (Anjoorian Affidavit ¶ 2).
Beginning in 1990, PT provided accounting services to FCC. The firm audited FCC's annual financial statements following the close of each calendar year between 1990 and 1994. (Pascarella Affidavit ¶ 3). The statements were prepared by FCC, who issued a "representation letter" to PT which stated, inter alia, that FCC was "responsible for the fair presentation in the financial statements of financial position." Id. ¶¶ 5-6 Ex. 2. PT's responsibility was to perform an audit in accord with generally accepted auditing standards and to "express an opinion on the financial statements" based on the firm's audit. Id. Ex. 1 (containing engagement letters).
PT prepared annual audit reports, which accompany a copy of the financial statements, for the years ending on December 31. (Fairway Capital Corporation Financial Statements for 1990-94, Ex. 3 to Pascarella Affidavit (collectively referred to as Financial Statements)). The first page of each financial statement contains the auditor's opinion that "the financial statements referred to above present fairly, in all material respects, the financial position of [FCC] . . . in conformity with generally accepted accounting principles. (Financial Statements, 1990-94.) Each report is addressed to "The Board of Directors and Shareholders" of FCC. Id. The 1990-94 statements indicate that "it is managements' opinion that all accounts presented on the balance sheet are collectible." See, e.g., 1990 Financial Statement 7. In addition, the 1991-94 statements indicate that "all loans are fully collateralized" according to the board of directors. See, e.g., 1991 Financial Statement 7.
On March 2, 1994, Plaintiff filed a complaint and motion for a temporary restraining order seeking the dissolution of FCC on various grounds (Dissolution Action). PT was not a party to that suit. As a result of that action, the three Kilberg children exercised their right, pursuant to G.L. 1956 § 7-1.1-90.1 (now codified at § 7-1.2-1315), to purchase the Plaintiff's shares of the corporation. The Court appointed an appraiser to determine the value of the Plaintiff's shares which the other shareholders would have to pay. (Appraiser's Report 13, C.A. 94-1125, Feb. 24, 1998). The bulk of FCC's assets was its right to receive payment for the loans it had made. The appraiser determined that the value of the corporation was $2,395,000, plus a payroll adjustment of $102,000, and minus a "loss reserve" adjustment to account for the fact that ten of FCC's thirty outstanding loans were delinquent. Id. The loss reserve adjustment reduced the total appraised value of the corporation by $878,234. Id.
Consequently, Plaintiff's fifty percent interest in the corporation was reduced accordingly by $439,117. See id.
Plaintiff ultimately received a judgment for $809,382.85 against the other shareholders in exchange for the buyout of his shares.See Judgment, Anjoorian v. Kilberg, C.A. No. 94-1125 (Mar. 13, 2001) aff'd 836 A.2d 1092, 1096 (R.I. 2003) (per curiam).
In 1997, the Plaintiff brought the present lawsuit against Kilberg, Kilberg's company, and PT.[1] He claims that PT was negligent in preparing the annual financial statements for FCC without including an accurate loan loss reserve in the statements. Plaintiff argues that he relied on the financial statements prepared by Defendants, and that if the statements had included a loan loss reserve, he would have sought dissolution of the corporation much earlier than 1994 when his shares would have been more valuable. (Anjoorian Affidavit ¶ 10.) Plaintiff has submitted an appraisal suggesting that the appropriate loan loss reserve figure would have been much less-and, therefore, his share value much higher — in the years 1990 and 1991.[2]
Plaintiff alleges that he lost over $300,000 in share value between 1990 and March 2, 1994. Nine years later, the Defendants have now moved for summary judgment on the malpractice claim.
 Standard of Review
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Super. Ct. R. Civ. P. Rule 56(c). The Court "does not pass upon the weight or the credibility of the evidence," but instead it must consider the evidence "in a light most favorable to the party opposing the motion." Palmisciano v. Burrillville Racing Ass'n,603 A.2d 317, 320 (R.I. 1992). "If there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross Blue Shield, 604 A.2d 1260, 1261 (R.I. 1992).
 Analysis
The Defendants have moved for summary judgment on the grounds that PT owed no duty to the Plaintiff as a shareholder, and that the Plaintiff's claims are barred by the statute of limitations. Defendants also argue that the Plaintiff's theory of damages is contrary to public policy and speculative. In addition, the Defendants have moved to strike portions of the Plaintiff's opposition to the motion for summary judgment, portions of Plaintiff's affidavit, and the Piccerelli affidavit in its entirety. The Court will first consider the statute of limitations argument. Then it will address the duty owed by accountants to third parties, and whether Plaintiff has a valid claim for damages. Finally it will address the motion to strike.
Statute of Limitations
A claim for accounting malpractice must be "commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action." G.L. 1956 § 9-1-14.1. The acts of malpractice alleged by Plaintiff are the failure of PT to include an accurate loan loss reserve in each of four financial statements for the years 1990, 1991, 1992, and 1993.[3]
Plaintiff filed his complaint on February 27, 1997, which means that acts of malpractice that occurred prior to February 27, 1994 are barred unless the discovery rule applies.[4]
The "discovery rule" provides that for injuries or damages
 "which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered." Section 9-1-14.1.
The discovery rule exists "to protect individuals suffering from latent or undiscoverable injuries" who only discover those injuries after the statute of limitations has expired. Canavanv. Lovett, Schefrin Hartnett, 862 A.2d 778, 783 (R.I. 2004) (citations omitted). While the Court will draw all inferences in favor of the plaintiff on this summary judgment motion, "it is not necessary for the plaintiff to fully appreciate the potential liability, or even be convinced of an injury" in order to start the three year limitations period. Id. (citations omitted). All that needs to be shown is that the Plaintiff was aware of facts that would put a reasonable person on notice that a claim exists.[5] Id. at 784. Therefore, if Plaintiff discovered or should have discovered the facts giving rise to his claim prior to February 27, 1994, his claim will be barred.
The 1990, 1991, and 1992 reports clearly were issued more than three years before the complaint was filed — the latest was issued in May of 1993-so claims arising from these reports must be analyzed under the discovery rule. If, prior to February 27, 1994, the Plaintiff should have discovered through reasonable diligence that these three financial statements were defective for failing to reflect a loan loss reserve, then claims arising out of these three reports would be barred. Plaintiff alleges in his affidavit that "[u]pon receipt of each audited statement, I reviewed the statements in detail. The purpose of my review was to keep track of the status and value of my substantial investment and to make ongoing decisions concerning my shareholder interest." (Anjoorian Affidavit ¶ 4.) However, Defendants have not shown that the existence of a loan loss reserve would be apparent on the face of the report or, more importantly, whether its absence where required would be conspicuous to a shareholder exercising reasonable diligence. If not, the shareholder would have no notice that the financial statements were defective. Therefore, taking the facts in the light most favorable to the Plaintiff, the Court finds that there is an unresolved issue of material fact which precludes summary judgment for the claims arising from the 1990, 1991, and 1992 reports.[6]
As to the 1993 financial statement, the Plaintiff did discover the alleged malpractice promptly — prior to PT issuing the financial statement for that year, in fact. Plaintiff alleges in his affidavit that he "first learned of certain issues related to [FCC's] 1993 year end audited statement on [Tuesday,] March 1, 1994," and the financial statement was issued on March 18, 1994, both dates which are narrowly within three years of the date the complaint was filed. See Affidavit of Paul V. Anjoorian, July 10, 2006 ¶ 7. Defendants, however, argue that either the Plaintiff or his agents must have had knowledge of the underlying facts no later than the close of business on the previous Friday, August 25, 1994.
On the evening of March 1, 1994, Plaintiff's attorney faxed documents, including an affidavit, to the defendants in the Dissolution Action. See Facsimile at 1, 12, Ex. D to Def's Mem. Supp. Mot. Summ. J. (containing a cover letter from the Plaintiff's attorney and a fax machine timestamp). That affidavit contained the opinion of Richard Tobin, an accountant hired by the Plaintiff, that FCC "has not provided for a bad loan reserve or loan collection reserve in the preparation of its financial statements." Id. ¶ 3. Therefore, Tobin and the Plaintiff's attorney had knowledge of the underlying facts of this lawsuit no later than March 1, 1994, which is dangerously close to the outside of the limitations period. Defendants argue that in order to fax that affidavit on a Tuesday evening, along with a complaint and temporary restraining order, the Plaintiff or his agents must have had knowledge of the facts contained in it by the close of business on the previous Friday, February 25, 1994.[7] If so, Plaintiff's claims arising from all of the financial statements would be barred by the statute of limitations.[8]
While Defendants' view is entirely possible, and perhaps likely, the Court cannot find as a matter of law that Plaintiff or his agents learned about the pertinent facts on or before the previous Friday, as Defendants argue.[9] It is possible that Tobin became aware of the absence of a loan loss reserve no earlier than Sunday, February 27, 1994 and that the attorney acted extraordinarily quickly to prepare the complaint, temporary restraining order, and affidavit for the Dissolution Action in order to fax them on Tuesday, March 1, 1994. Further, the Plaintiff's affidavit contends that he personally did not know of the pertinent facts prior to March 1, 1994. (Anjoorian Affidavit ¶ 7). If so, the Defendants would have had until at least February 27, 1997 to file their complaint and they did so on that day. Because the Defendants have not presented evidence which forecloses this possibility, the Court finds that there exists a genuine issue as to when the pertinent facts were discovered, and therefore the Court cannot conclude that Plaintiff's claims are barred for purposes of this summary judgment motion.
Duties Owed by Accountants in the Preparing of FinancialStatements
The Defendants argue that they are entitled to summary judgment on Plaintiff's negligence claim because PT owed no duty to the Plaintiff as a shareholder of FCC. Our Supreme Court has acknowledged that the duty of accounting professionals to third parties is an open question in Rhode Island, but it did identify at least three competing views: the foreseeability test, the near-privity test, and the Restatement test. Bowen Court Assocs.v. Ernst Young, 818 A.2d 721, 728 n. 2 (R.I. 2003); see Carl Pacini et. al., At the Interface of Law and Accounting: AnExamination of a Trend Toward a Reduction in the Scope of AuditorLiability to Third Parties in the Common Law Countries, 37 Am. Bus. L.J. 171, 175 (2000) (noting that the standards lie on a continuum, and each may produce different results for the same set of facts).
There are two competing policy concerns underlying each of the tests. The first is compensation, because a person who relies on an accountant's work product should not have to bear the loss arising from that accountant's malpractice. Rusch Factors Inc.v. Levin, 284 F. Supp. 85, 90-91 (D.R.I. 1968). However, a second policy favors limiting liability for accountants to certain individuals or groups of individuals in order to make the risk of loss manageable.
In the financial world, there is a significant potential for the widespread dissemination of the information from financial statements beyond the uses for which it was prepared. See
Restatement (Second) of Torts § 522, com. a (1977); see alsoUltramares Corp. v. Touche, Niven Co., 255 N.Y. 170, 179-180
(N.Y. 1931) (Cardozo, J.) (noting that
 "[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.")
An auditor can only balance the risks and rewards involved with the uses of financial information if he knows the uses to which the information will be put. See Restatement (Second) § 552 com. a.[10] "By receiving notice of the third parties to whom potential liability may be incurred, the auditor can decide whether to accept the engagement, adjust the audit plan to meet the needs of third parties, and/or negotiate audit fees that are commensurate with the scope of liability." Pacini, et al., 37 Am. Bus. L.J. at 178 n. 46.[11] Therefore, many Courts have placed limits on the scope of an auditor's potential liability so that they might successfully manage the risks inherent in their profession. See Pacini, et al., 37 Am. Bus. L.J. at 175-79.
The foreseeability test provides the most expansive scope of liability. Under that approach, "[w]hen the independent auditor furnishes an opinion with no limitation . . . as to whom the company may disseminate the financial statements, he has a duty to all those whom that auditor should reasonably foresee as recipients" provided only that the user receive the statements from the company for "proper business purposes." Rosenblum, Inc.v. Adler, 461 A.2d 138, 153 (N.J. 1983) superseded by N.J. Stat. Ann. 2A: 53A-25. (West 1998). This rule gives little weight to the concern for limiting the potential liability for accountants and is not widely adopted. See Pacini, et al., 37 Am. Bus. L.J. at 179. Under this approach, however, PT clearly would owe a duty to the shareholders of the corporation for whom the audit is performed because it is eminently foreseeable that shareholders would rely on the company's financial statements to evaluate the status of their investment.
At the other end of the spectrum are the privity and near-privity tests. The privity test is the most restrictive and requires that "a contractual relationship . . . exist between an accountant or auditor and another party. . . ." Id. at 175. If privity existed, there would be no need to analyze duties to third parties because the Plaintiff would be the client. Under this approach, it seems clear that the Plaintiff's claim must fail. Defendant Pascarella states in his affidavit that his main contact at FCC was Arnold Kilberg, that he never met or spoke with the Plaintiff or any of the shareholders of FCC, that he did not know of their intended use of the financial statements, and that FCC paid for the accounting services. (Pascarella Affidavit ¶¶ 14-17, June 12, 2006.) Defendant Trench testified similarly in his deposition. (Trench Deposition, Ex. C to Def's Mem. Supp. Mot. Summ J., 14:23-15:8.) Therefore, Plaintiff is not in privity, and Plaintiff's claim that the financial statement was addressed "to the board of directors and shareholders" is appropriately treated as a third-party issue.
The near-privity test expands the scope of accountants' liability from those in privity to include those third parties who rely on the accountants' work, when
 "(1) the accountants [are] aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance." Credit Alliance Corp. v. Arthur Andersen Co., 483 N.E.2d 110, 118 (N.Y. 1985).
The Restatement expands the scope of liability from the privity and near-privity approaches, but not to the extent of the foreseeability approach. It states that an accountant's liability will be limited to losses suffered
 "(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information . . . and
 (b) through reliance upon it in a transaction that he intends the information to influence . . . or in a substantially similar transaction." Restatement (Second) of Torts, § 522.
So when an accountant or auditor fails to exercise reasonable care, he is only liable to intended persons or classes of persons, and only for intended transactions or substantially similar transactions. Id. § 522, com. i. The Restatement approach differs from the near-privity test in that it applies not only specific persons and transactions contemplated by the accountant, but also specific classes of persons and transactions. Id. § 552 com. h; see Pacini, et al., 37 Am. Bus. L.J. at 178-79. Therefore, the Restatement approach does not utilize the third prong of the Credit Alliance test, which requires conduct on the part of the accountants linking them to the persons relying on the information. Credit Alliance,483 N.E.2d at 119 n. 11.
This Court finds, as do the courts of many jurisdictions, that the Restatement approach strikes the appropriate balance between compensating victims of malpractice and limiting the scope of potential liability for those who certify financial statements.See, e.g., Nycal Corp. v. KPMG Peat Marwick LLP.,688 N.E.2d 1368, 1372 (Mass. 1998) (the Restatement test "properly balances the indeterminate liability of the foreseeability test and the restrictiveness of the near-privity rule); BadischeCorp. v. Caylor, 356 S.E.2d 198, 200 n. 2 (Ga. 1987) (finding the Restatement to be the appropriate "middle ground"). Therefore, the Court finds that the Restatement rule is the better-reasoned approach and appears to be the majority rule. However, under either the near-privity approach or the Restatement approach, the outcome will depend on whether PT intended for the Plaintiff to rely on these statements, and if so, for what purpose or transaction did PT intend for the Plaintiff to rely on the statements.[12] The Plaintiff suggests that the Rhode Island Supreme Court would probably adopt the foreseeability approach because of dicta quoted from the U.S. Supreme Court. However, our Court explicitly declined to rule on the issue, and the case cited addressed an entirely different matter — whether an accountant's work papers were privileged from disclosure.[13]
Following the Restatement approach, the U.S. District Court of Rhode Island, while attempting to discern Rhode Island law, found that an accountant can be held liable in negligence for "misrepresentations relied upon by actually foreseen andlimited classes of persons," Rusch Factors, Inc.,284 F. Supp. at 93 (emphasis added). In that case, the Plaintiff was a potential creditor of the corporation which requested audited financial statements from the corporation before advancing funds.284 F. Supp. at 92. "[A]lthough they were compensated for their services by the company," the defendant accountants "actually knew the plaintiff and prepared the balance sheets for him."Id. at 92.
The Court agrees with the holding in the Rusch Factors, Inc.
decision, but disagrees with Plaintiff that it adopts the foreseeability rule. See 284 F. Supp. at 91-92. Even under the Restatement test and perhaps the near-privity test, the facts inRusch Factors, Inc. would be sufficient to find a duty because the accountants prepared their financial statements with the intent that the creditor would use them in a specifically contemplated loan transaction. See id. The foreseeability rule, conversely, would find a duty to all foreseeable persons, whether or not they were actually foreseen, and this is hardly a limited class of persons.[14] Therefore, the holding that an accountant has a duty to "actually foreseen and limited
classes of persons" is more consistent with the Restatement's reference to "intended" persons and transactions, and in fact theRusch Factors, Inc. Court cites the to Restatement rule. Seeid. at 91-92, 93 (emphasis added).[15]
Turning now to the facts of this case, the Court must determine if a genuine issue exists as to whether PT intended the Plaintiff to use the financial statements, and if so, for what purpose. The Defendant Pascarella asserts that he never met the Plaintiff (Pascarella Affidavit ¶¶ 8, June 12, 2006). He further states that his main contact at FCC was Arnold Kilberg, that he never met or spoke with the Plaintiff or any of the shareholders of FCC, that he did not know of their intended use of the financial statements, and that FCC paid for the accounting services. Id. ¶¶ 14-17. Defendant Trench testified similarly in his deposition. (Trench Deposition, Ex. C to Def's Mem. Supp. Mot. Summ J., 14:23-15:8.)
However, Plaintiff responds that each of the financial statements was addressed to the "Board of Directors and Shareholders" of FCC. See Financial Statements. The Court finds that the addressing of the reports to the shareholders, while not conclusive, is a strong indication that PT intended the shareholders to rely upon them.[16] Therefore, the Court concludes that genuine issues of fact exist as to whether PT intended for Plaintiff to rely on these financial statements. Perhaps the Court would reach a different conclusion for a widely held public corporation with a potentially unlimited number of shareholders whose identities change regularly. Here, however, FCC was a close corporation with only four shareholders, giving greater significance to the fact that the financial statements were addressed "to the shareholders."
Defendants also argue that, in order to find a duty to third-parties, an accountant must have contemplated a specific transaction for which the financial statement will be used and that no such transaction was contemplated here. See Restatement (Second) of Torts § 552(2)(b) com h (concluding in illustration 10 that an accountant would not have a duty to a bank where he conducted an audit "of the customary scope for the corporation" and a bank subsequently relied upon it to advance credit to the corporation). The Court finds this argument unavailing.
The case at bar is unusual in that the alleged malpractice did not arise from a specific financial transaction. The typical case involves a person whose reliance on a defective financial statement induces the person to advance credit or invest new equity into the corporation. See, e.g., Rusch Factors,Inc., 284 F. Supp. at 86-87; Credit Alliance,483 N.E.2d at 111. When the investment is lost, or the loan unpaid, the person sues the accountant. In this case, however, the Plaintiff had already invested his capital in the corporation when PT was hired, and alleges that he used the financial statements as a tool to evaluate the value of that investment. (Anjoorian Affidavit ¶ 4). The alleged malpractice did not result in Plaintiff advancing new value to the corporation and then losing his investment, but instead resulted in the Plaintiff failing to withdraw his capital from the corporation while its value was higher.[17]
This Court would have no difficultly finding a duty in this case, in the absence of a specific financial transaction, if it can be shown that PT intended the shareholders to rely on the financial statements for the purpose of evaluating the financial health of the company, and therefore, their investment in the company. In this case, the "particular transaction" contemplated by the Restatement relates to the purpose for which the financial statements would be used — in this case, the shareholders' decision whether to withdraw their capital or not. See
Restatement (Second) of Torts § 552(2)(b). While it remains to be proved that PT actually did foresee that their financial statements would be used by the shareholders in this manner, the absence of a particular financial transaction does not preclude the finding of a duty in this case.[18]
Because the value of the shareholders' investment was limited to the amounts reflected in the company balance sheets, any loss from malpractice was an insurable risk for which accounting professionals can plan. See Rusch Factors, Inc.,284 F. Supp. at 91. Further, the accountants may have further curtailed their exposure by placing an appropriate disclaimer on the financial statements to warn shareholders that they rely on the financial statements at their peril. See, e.g., First Nat'l Bank v.Sparkmon, 442 S.E.2d 804, 806 (Ga.Ct.App. 1994) (finding disclaimers effective "to preclude any justifiable reliance by a third party upon the . . . reports they prefaced").[19]
Therefore, the policy which would justify limits on accountant liability would not apply if the requisite intent is found.
Plaintiff's Theory of Damages
The Defendants argue that Plaintiff's theory of damages is speculative and against public policy. Plaintiff bases his damage claims on the assertion that he relied on four annual audited financial statements in order to evaluate the status of his $1.26 million investment in FCC. (Anjoorian Affidavit, ¶ 2-4.) Because the statements failed to include a loan loss reserve figure, he argues that the statements overstated the value of the corporation at the end of each year from 1990 to 1993. When Plaintiff sought dissolution in 1994, the value he obtained for his shares was significantly less than his expectation, which was informed by the financial statements. He contends that if he had accurate financial information, he would have liquidated his investment earlier when his shares were more valuable.
The Court disagrees that the amount of damages is speculative. Using the figures provided by Plaintiff's expert for purposes of this motion, it is relatively easy to calculate the amount of damages suffered by the Plaintiff. (Piccerelli Affidavit ¶ 13). The following table compares the value of Plaintiff's shares as presented in PT's financial statements, and the value of those shares after accounting for the loan loss reserve contained in the affidavit of the Plaintiff's appraiser.
 ---------------------------------------------------------------------------------------------
| | (1) | (2) | (3) | (4) | (5) |
| | Total | Value of | Loan Loss | "Actual" | "Actual" |
| | Shareholder | Plaintiff's | Reserve[21] | Value of | Value of |
| | Equity — | 50% Equity — | | FCC | Plaintiff's |
| | FCC | = (1) * 50% | | = (1)-(3) | 50% Equity |
| | Financial | | | | = (4) * 50% |
| | Statements[20] | | | | |
|------|-------------------|---------------|-----------------|---------------|----------------|
| Dec. | $ 2,812,606 | 1,406,303 | 251,490 | 2,561,116 | 1,280,558 |
| 1990 | | | | | |
|------|-------------------|---------------|-----------------|---------------|----------------|
| Dec. | 2,936,965 | 1,468,483 | 550,321 | 2,386,644 | 1,193,322 |
| 1991 | | | | | |
|------|-------------------|---------------|-----------------|---------------|----------------|
| Dec. | 2,664,714 | 1,332,357 | 879,283 | 1,785,431 | 892,716 |
| 1992 | | | | | |
|------|-------------------|---------------|-----------------|---------------|----------------|
| Dec. | 2,520,000 | 1,260,000 | 900,835 | 1,619,165 | 809,583 |
| 1993 | | | | | |
|------|-------------------|---------------|-----------------|---------------|----------------|
| Mar. | | | | | 2,809,383 |
| 1994 | | | | | [22] |
 ---------------------------------------------------------------------------------------------

Plaintiff's appraiser purports to calculate the loan loss reserve figure for 1990 to 1993 according to the method utilized by the appraiser in the Dissolution Action. (Piccerelli Affidavit ¶ 13.) Comparing column 1 to column 4 gives the amount by which the value of FCC was allegedly overvalued by the financial statements. Accordingly, columns 2 and 5 demonstrate the value by which Plaintiff's shares were overvalued.
Finally, column 5 demonstrates fairly clearly how Plaintiff could calculate the damages and negates the notion that they are speculative. One need only subtract the value received from the March, 1994 dissolution judgment from the value of the shares at some earlier time — whatever time Plaintiff would have liquidated his shares. Plaintiff's appraiser alleges that if the Plaintiff had liquidated his shares at an earlier time, he would have saved $163,957 in share value if he had sought dissolution at the end of 1991, and would have saved an additional $149,415 if he had liquidated at the end of 1990, rather than waiting until March, 1994. (Piccerelli Affidavit ¶ 14.)[23]
In order to be entitled to damages, however, Plaintiff must also prove that the Defendants' alleged negligence was the cause of his damages. Defendants correctly point out that the Plaintiff's claim rests on the crucial assumption that, had a loan loss reserve figure been included in the financial statements, he would have liquidated his shares. At the end of any given year, all that Plaintiff could know was the value provided in that year's financial statement — not the future appreciation or depreciation of his equity. This data shows that in 1990, the Plaintiff's shares were allegedly overvalued, but this does not necessarily mean that he would have liquidated his shares. The 1991 data reveals that the Plaintiff's shares appreciated from its 1990 value according to the FCC financial statements, but depreciated by approximately $90,000 according to Plaintiff's expert. Although the depreciation may have raised some concern on Plaintiff's part, even this discrepancy is not conclusive evidence that Plaintiff would have liquidated his shares. At this stage of litigation, however, for purposes of summary judgment, the Court must rule against the Defendant on this issue. Plaintiff asserts that he would have liquidated his shares with the aid of accurate financial data, and while it is by no means a certainty, Plaintiff is entitled to attempt to prove this fact.
Defendant's Motion to Strike
The Defendants have moved to strike the Piccerelli Affidavit in its entirety, as well as portions of Plaintiff's opposition to the motion for summary judgment and portions of Plaintiff's affidavit. In regards to the Piccerelli Affidavit, Defendants argue that it is contradictory to earlier statements made in conjunction with the Dissolution Action. The earlier statements identified by the Defendant include Piccerelli's 1996 report, 1998 testimony, and an interrogatory response describing Piccerelli's expected testimony.
While the Supreme Court has not considered the question of how to treat affidavits that conflict with earlier testimony, this Court has considered such motions on numerous occasions — usually in connection with prior deposition testimony. See, e.g.,Chain Store Maint, Inc. v. National Glass Gate Serv. Inc.,
No. PB 01-3522, 2004 R.I. Super. LEXIS 81, *9 to * 15 (R.I.Super.Ct. April 21, 2004) (Silverstein, J.); Rowey v.Children's Friend Serv., No. 98-0136, 2003 R.I. Super. LEXIS 153, *12 to *13 (R.I.Super.Ct. December 12, 2003); Dryvit Sys.v. Feldspar Corp., No. 93-108, 1995 R.I. Super. LEXIS 47, *6 to *7 (R.I.Super.Ct. January 19, 1995).
Where the procedural rules on a particular topic are substantially similar, Rhode Island courts will look to federal case law for guidance. Smith v. Johns-Manville Corp.,489 A.2d 336, 339 (R.I. 1985). Although there is "uniform agreement" that a trial court may grant summary judgment over an affidavit which conflicts with earlier deposition testimony, the mode of analysis is not uniform. See Jeffrey L. Freeman, Annotation, Propriety,under Rule 56 of the Federal Rules of Civil Procedure, ofGranting Summary Judgment When Deponent Contradicts in AffidavitEarlier Admission of Fact In Deposition, 131 A.L.R. Fed. 403 (2005).
Some circuits hold that a court should consider a conflicting affidavit in order to determine if a genuine factual dispute exists, and may disregard it only when the affidavit presents a "sham" factual issue. See, e.g., Lane v. Celotex Corp.,782 F.2d 1526, 1532 (11th Cir. 1986) (finding a sham only when the affidavit contradicts clear answers to unambiguous questions contained in previous testimony). The line of cases on which Defendants rely holds that a party may not, without explanation of the inconsistency, create an issue of fact by submitting an affidavit that conflicts with prior sworn testimony. SeeColantuoni v. Alfred Calcagni Sons, 44 F.3d 1, 5 (1st Cir. 1994) followed by Chain Store Maint., Inc., 2004 R.I. Super. LEXIS 81 at *11; Rowey v. Children's Friend Serv., 2003 R.I. Super. LEXIS 153 at *14 (finding the reasoning of the First Circuit persuasive, but denying motion to strike because affidavit did not squarely conflict with prior testimony); seealso Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994). Indeed, the purposes of summary judgment would be severely impaired if a party could defeat it simply by submitting an affidavit that contradicts earlier testimony. See Freeman, 131 A.L.R. Fed. at 2. However, even under the latter view, which more frequently excludes affidavits, the Court must deny Defendant's motion because no clear contradiction appears in the record.
Piccerelli's 1996 valuation report was submitted to the Court in order to determine the value of FCC and Plaintiff's equity in FCC on March 7, 1994. See Piccerelli Report on Valuation of Fairway Capital Corporation 1-3, November 15, 1996. It begins with the year-end book value of the corporation according to the 1993 financial statement, then accounts for transactions from January 1, 1994 to March 7, 1994, and then makes whatever other adjustments are necessary to render an accurate valuation of FCC.Id. at 3. The report noted that any changes in the value of FCC's loan portfolio would significantly affect the value of the corporation, but as did PT, Piccerelli's report declined to adjust the value with a loan loss reserve because it relied on the conclusion of FCC's board that all of the loans were adequately collateralized. See id. at 4-5. It also relied on the fact that, if PT had uncovered any underlying problems with the value of the loan portfolio, it would have had a professional obligation to disclose them. Piccerelli's testimony and the interrogatory response contain similar content.
The Court finds that Piccerelli's affidavit does not contradict the earlier statements when it states that PT should have done an independent analysis of the loan portfolio instead of relying on assertions of FCC's management that the loans were adequately collateralized. (Piccerelli Affidavit ¶ 5). Merely because Piccerelli himself relied on management's assertions and PT's audit, for purposes of litigation, does not resolve the issue of whether PT should have investigated the loans more thoroughly in the annual audit. At best, this argument reduces the weight of Piccerelli's testimony, but there still remains a genuine issue of fact that is inappropriately resolved at this stage.
Further, even if some of the Piccerelli affidavit contradicts his earlier statements in the Dissolution Action, not every paragraph of the affidavit does so. A motion to strike should be precise, stating "specifically the portions of the affidavit to which objection is being made, and the grounds therefor." PermaResearch Dev. Co. v. Singer Co., 410 F.2d 572, 579 (2d Cir. 1969) (citation omitted). The most important part of his affidavit for purposes of this motion are paragraphs 13 and 14. These paragraphs analyze the value of the corporation using the method utilized by the appraiser in the Dissolution Action. Even if Piccerelli believed that this method was improper, he can still testify to the values that the method would produce, so these paragraphs are not contradictory.
Finally, assuming arguendo that Mr. Piccerelli's affidavit in this matter does contradict his earlier statements in some way, striking his affidavit will not result in the grant of summary judgment because a question will still remain as to whether PT breached the applicable standard of care. The allegedly contradictory statements are only relevant insofar as they demonstrate whether a loan loss reserve was appropriately included in the financial statements, and therefore whether PT breached its duty of care in auditing those financial statements. The appraiser in the Dissolution Action determined that the inclusion of a loan loss reserve in the financial statementswas proper, and that creates a genuine issue as to whether a breach occurred regardless of Mr. Piccerelli's opinion on the subject. For these reasons, the Court denies the motion to strike the Piccerelli affidavit.
Defendants also contend that the Plaintiff's opposition and affidavit contain factual assertions that are irrelevant or unsupported by the record. While a motion to strike a pleading is proper under Super. R. Civ. P. Rule 12(f), and a motion to strike may be proper in other circumstances not specifically covered by rule, the Court questions the need to strike portions of another party's brief. See Custom Vehicles, Inc. v. Forest River,Inc., 2006 U.S. App. LEXIS 24191, *2 to *4 (7th Cir. 2006) ("[t]he way to point out errors in an appellee's brief is to file a reply brief, not to ask a judge to serve as editor"). Therefore, the Court denies the motion to strike, but where appropriate it has considered the Defendants' position on the subject of whether malpractice has occurred.
Paragraphs 11 and 12 of Plaintiff's affidavit relate to the Plaintiff's previous settlement with other defendants in this case, as well as the identity of PT's insurance carrier, and do not pertain to any of the issues relevant to this summary judgment motion. Affidavits submitted for purposes of summary judgment must set forth admissible facts. See Super. R. Civ. P. Rule 56(f). Therefore, the Court grants the motion to strike paragraphs 11 and 12 of Plaintiff's affidavit.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court denies the Defendant's motion for summary judgment. It denies the motion to strike the Piccerelli Affidavit, as well as the motion to strike portions of Plaintiff's opposition. The Court grants the motion to strike paragraphs 11 and 12 of Plaintiff's affidavit.
Prevailing counsel may present an order and judgment consistent herewith which shall enter upon notice to all other counsel of record.
[1] The Plaintiff has settled its claims against Arnold Kilberg and Arnold Kilberg Co.
[2] According to the Plaintiff's appraiser, at the end of 1990 and 1991, the loss reserve figures would have been $251,490 and $550,321 respectively. (Piccerelli Affidavit ¶ 13, July 10, 2006.) Therefore, Plaintiff's shares lost $149,415 in value between 1990 and 1991, and lost an additional $163,957 in value between 1991 and 1993. Id. ¶ 14.
[3] These reports were dated April 26, 1990; April 10, 1992; May 6, 1993; and March 18, 1994; respectively. The date on the report for 1990 appears to be a typographical error and should probably read April 26, 1991.
[4] "Whenever time is to be reckoned from any day, date, or act done, or the time of any act done, the day, date, or the day when the act is done shall not be included in the computation." G.L. 1956 § 43-3-13; see Burke v. Rhode Island College,671 A.2d 803, 804 (R.I. 1996) (describing how to compute time for a three year statute of limitations).
[5] The Court will assume arguendo that if Plaintiff's agents discover the facts underlying his cause of action, that constitutes discovery by the Plaintiff himself. Because of the Court's resolution of these issues, it need not decide that question.
[6] Determination of this issue may be critical at trial. If the claims arising from the 1990 and 1991 statements are barred, the Defendants will likely prevail since the affidavit of Plaintiff's appraiser indicates that little or no harm was suffered as a result of the 1992 and 1993 reports. See
Piccerelli Affidavit ¶¶ 13, 14 and discussion infra.
[7] The timestamp on the faxed affidavit indicates it was sent after 5 p.m. on Tuesday, March 1, 1994.
[8] Once the Plaintiff learned of the alleged defect in the 1993 financial statement, reasonable diligence would compel him to promptly examine the 1990-92 statements for the same defect. Therefore, the discovery rule was triggered no later than March 1, 1994 for claims arising out of all of the financial statements.
[9] The 1993 Financial Statement was not transmitted until March 18, 1994, so the statement itself appears not to be the source of Defendant's knowledge. See Def's Mem. Supp. Mot. Summ J., Ex. A(3) at 2.
[10] "[T]he duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect." Restatement (Second) of Torts, § 552 com. a.
[11] For example, an auditor will commit a higher amount of resources to an audit, and consequently charge a higher fee, if a contemplated transaction is a $500,000 loan versus a $15,000 loan. See Restatement (Second) of Torts § 552 com. j.
[12] The absence of any meeting whatsoever between Plaintiff and PT probably negates the existence of any "conduct on the part of the accountants" linking them to Plaintiff which would "evince the accountants' understanding of [Plaintiff's] reliance." See Credit Alliance, 483 N.E.2d at 118. If so, then Plaintiff probably cannot meet the requirements of the near-privity test. Nevertheless, the Court reserves judgment on this issue because the fact that the financial statements were addressed to the board of directors and shareholders of a corporation with only four shareholders may be sufficient conduct on the part of the accountants to satisfy this requirement.
[13] "[B]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client." Bowen Court Assocs. v. Ernst Young, 818 A.2d 721, 728 (R.I. 2003) (quoting United States v.Arthur Young Co., 465 U.S. 805, 817 (1984)).
[14] See Restatement (Second) of Torts § 552 com. h (noting in illustration 10 that financial statements accompanied by an auditor's opinion are "customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions").
[15] The Rusch Factors, Inc. Court did not "rule upon . . . the question of whether an accountant's liability . . . ought to extend to the full limits of foreseeability."284 F. Supp. at 93.
[16] This also may satisfy the third prong of the near-privity test which requires conduct on the part of the accountants evincing an understanding of the third party's reliance. CreditAlliance, 483 N.E.2d at 118.
[17] The only case cited by the Defendant which contains this factual scenario is an unpublished case from Minnesota, which is of no precedential value even in Minnesota. In that case, the appellate court upheld a motion to dismiss where the plaintiff claimed that defective financial statements and audit reports induced plaintiff to purchase and continue holding stock. SeeLoop Corp. v. McIlroy, 2004 Minn. App. LEXIS 1146, *5 to*6 (Minn.Ct.App. 2004). In that case though, the plaintiff could not show that its reliance on the financial statements was specifically foreseen or intended by the accounting firm. Id.
*"8 to *10.
[18] The Court also notes that accountants may not escape liability by "burying their heads in the sand" to avoid discovering how an intended recipient will utilize financial statements. See North Am. Specialty Ins. Co. v. Lapalme,258 F.3d 35, 39 (1st Cir. 2001) ("the Restatement standard will not excuse an accountant's willful ignorance" (internal quotations omitted)).
[19] The financial statements prepared by PT appears to contain no such disclaimer, although FCC was obliged to notify PT before publishing or reproducing any of the financial statements. See Engagement Letters, Exhibit 1 to Pascarella Affidavit.
[20] Taken from the Statement of Shareholders' Equity contained in each Financial Statement for 1990 to 1994.
[21] Piccerelli Affidavit ¶ 13.
[22] Judgment, Anjoorian v. Kilberg, C.A. No. 94-1125 (Mar. 13, 2001), aff'd 836 A.2d 1092, 1096 (R.I. 2003) (per curiam) (rounded to nearest dollar).
[23] Conversely, the plaintiff suffered little or no harm from not having liquidated his shares in either December 1992 or December 1993. By then the actual value of the corporation, according to Piccerelli, was very close to the value received by Plaintiff in the dissolution action.